## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **TEDDY L. MICKLES,** | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 1:21cv00020 |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By:   PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

*I. Background and Standard of Review*

Plaintiff, Teddy L. Mickles, ("Mickles"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423. Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Mickles protectively filed an application for DIB on February 25, 2016, alleging disability as of November 20, 2015, due to an enlarged heart; chest pain; sleep apnea; chronic obstructive pulmonary disease, ("COPD"); breathing problems and shortness of breath; back, neck, left shoulder and bilateral foot pain; migraine headaches; and low blood sugar. (Record, ("R."), at 154, 317-18, 364.) The claims were denied initially and on reconsideration. (R. at 177-79, 183-85, 188-91, 193-95.) Mickles requested a hearing before an administrative law judge, ("ALJ"). (R. at 196-97.) A hearing was held on March 6, 2018, at which Mickles was represented by counsel. (R. at 90-127.) On August 8, 2018, the ALJ rendered an unfavorable decision, denying Mickles's claim. (R. at 154-64.) Thereafter, Mickles pursued his administrative appeals, and the Appeals Council vacated the hearing decision and remanded the case to the ALJ for further consideration.[2] (R. at 171-72.) In accordance with the Appeals Council's Order, a second hearing was held on May 7, 2020, at which Mickles, again, was represented by counsel. (R. at 47-88.)

---

[2] Specifically, the Appeals Council found that the hearing decision did not contain an evaluation of psychologist Lanthorn's opinions. (R. at 171.)

By decision dated June 1, 2020, the ALJ, again, denied Mickles's claim. (R. at 22-38.) The ALJ found Mickles met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2020. (R. at 25.) The ALJ found Mickles had not engaged in substantial gainful activity since November 20, 2015, the alleged onset date.[3] (R. at 25.) The ALJ determined Mickles had severe impairments, namely cervical degenerative disc disease; mild lumbar degenerative disc disease; obesity; heart disease; hypertension; and sleep apnea, but he found Mickles did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 25-29.) The ALJ found Mickles had the residual functional capacity to perform sedentary[4] work, except he could occasionally lift 20 pounds and frequently lift 10 pounds; he required a sit-stand option at will; he could never climb ladders, ropes or scaffolds; he could frequently balance; he could occasionally climb ramps or stairs, stoop, kneel, crouch and crawl; he could occasionally reach overhead; and he should avoid concentrated exposure to pulmonary irritants, chemicals and hazards, such as moving machinery and heights. (R. at 29.) The ALJ found Mickles was unable to perform any of his past relevant work. (R. at 36.) Based on Mickles's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Mickles could perform, including the jobs of a final

---

[3] Thus, Mickles must demonstrate he was disabled between November 20, 2015, the alleged onset date, and June 1, 2020, the date of the decision, in order to be eligible for DIB benefits.

[4] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2021).

assembler and a suture gauger. (R. at 36-37, 77-78.) Thus, the ALJ concluded Mickles was not under a disability as defined by the Act, and he was not eligible for DIB benefits. (R. at 37-38.) *See* 20 C.F.R. § 404.1520(g) (2021).

After the ALJ issued his decision, Mickles pursued his administrative appeals, (R. at 309-12), but the Appeals Council denied his request for review. (R. at 1-6.) Mickles then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2021). This case is before this court on Mickles's motion for summary judgment filed October 5, 2021, and the Commissioner's motion for summary judgment filed November 4, 2021.

## *II. Facts*

Mickles was born in 1972, (R. at 317), which, at the time of the alleged onset date and the time of the ALJ's decision, classified him as a "younger person" under 20 C.F.R. § 404.1563(c). He has a high school education with special education services and past work experience as a roof bolter and a scoop operator. (R. at 51-53, 74-75, 105.) Mickles testified he was laid off from his underground coal mine job in 2015, which he believed was due to his health issues, as his boss repeatedly said the only thing in his record was family medical leave. (R. at 98, 103.) In particular, Mickles stated he had taken time off to recover from a staph infection, to undergo pulmonary testing and to undergo heart catheterizations. (R. at 103.) However, the company told him it had to cut back on some people. (R. at 54.) Mickles stated he received unemployment compensation for a couple of quarters while he looked for other work, but he had not worked at all since being laid off. (R. at 54, 99.) At the March 2018 hearing, Mickles testified his breathing was becoming

worse, and he no longer was able to work. (R. at 100.) He stated he became short of breath after about 30 minutes of moving around, and his chest would begin hurting, requiring him to sit down and rest for a couple of hours before he could move around again. (R. at 57, 100-01.) He explained the shortness of breath strained his heart, making it pump more and causing it to swell. (R. at 109.) Mickles further stated it "hurts so bad" and caused arm numbness, mostly on the left side, although he said he had right-sided chest pain and arm pain, too. (R. at 109-10.) He testified he had undergone three heart catheterizations. (R. at 67.) By the May 2020 hearing, Mickles said he had been having chest pain about every other hour, for which he had been prescribed nitroglycerin. (R. at 67-68.) Also at this hearing, he testified his breathing had worsened, and he estimated he could only climb four stairs without losing his breath and having to rest for 30 minutes to an hour before continuing. (R. at 70-71.) He, again, testified that walking and moving around, as well as carrying things, caused shortness of breath. (R. at 73.)

Mickles also testified, at the time he was laid off, he was having constant back pain. (R. at 53.) He said he had lower back pain, which mostly hurt when he was up on his feet and when he walked more. (R. at 114.) Although he did not require an assistive device, he said he used the shopping cart to support his weight when he shopped in stores. (R. at 101-02.) Mickles testified he did not take medication for his back pain, and he would sit to let it ease off. (R. at 114.) Although his primary care provider had referred him to a back specialist, Mickles testified he could not afford to go. (R. at 102.) He said his back pain worsened after he stopped working, noting he had difficulty sitting, which was more painful than standing/walking. (R. at 57-58.) Mickles testified at the May 2020 hearing that walking 40 feet caused foot and back pain, in addition to the shortness of breath. (R. at 73.) He stated sitting caused his legs to go numb after 10 minutes, requiring him to change positions. (R.

at 58.) Mickles stated he was having this problem as early as 2015 or 2016, but it had worsened. (R. at 58-59.) He stated he reclined 10 to 15 times daily, totaling about four hours in an eight-hour day. (R. at 59.) At the March 2018 hearing, Mickles described redness, dryness and "spotty looking" feet. (R. at 114.) He said his primary care provider wanted him to see a foot specialist, but he did not due to lack of insurance. (R. at 114.) Mickles said his feet hurt when he was on them more and if he wore shoes a lot. (R. at 115.) By the May 2020 hearing, he testified he had been seeing a podiatrist who had administered three injections in each foot, but which had not resolved his foot pain and numbness, which approached the knees in both legs, and which had worsened since the previous hearing. (R. at 68-69.) Mickles stated he also had bilateral carpal tunnel syndrome, ("CTS"), that caused pain and numbness in his hands and fingertips and caused him to drop things. (R. at 60-61, 107-08.) He said they were numb and tingling upon awakening in the morning, but it went away as he began to use them. (R. at 59-60.) However, Mickles testified if he grabbed an object to hold onto, his hand went numb almost immediately, and it took 20 to 30 seconds for the feeling to return after moving his hands or holding them down. (R. at 59, 108.)

Mickles testified he could not sit straight up with his arms and hands out in front at tabletop or chest level to manipulate or handle objects due to the numbness and tingling. (R. at 60.) He testified he could lift a gallon of milk for a few seconds, but he could not carry it for 10 feet with one hand; instead, he would have to switch hands back and forth due to numbness. (R. at 61.) He said he lost feeling in his arms up to his elbows when performing overhead activities. (R. at 61.) Mickles also testified he had headaches, which sometimes lasted two days, and which required him to rest or lie down three to four times daily for an hour each time. (R. at 111-12.) He reported that 800mg Motrin did not help. (R. at 111.) Mickles also testified

he experienced dizzy spells, more when his head started hurting badly. (R. at 111.) At the May 2020 hearing, Mickles testified he was having about two migraines monthly, requiring him to "lay around in a dark place with a pillow over [his] head" for one to two hours. (R. at 70.) He also testified he had neck pain that radiated into his left shoulder and prevented him from moving his head much. (R. at 61-62, 113.) He said this caused left arm and left shoulder pain, but, aside from the numbness issue, he could raise his right arm over his head. (R. at 62.) Mickles stated he had to sit and rest and let it ease off. (R. at 113.) He testified he had to prop his head with two pillows to keep it relaxed while he slept. (R. at 113.) Mickles also testified he had obstructive sleep apnea, ("OSA"), for which he used a continuous positive airway pressure, ("CPAP"), machine. (R. at 113.) He testified he stayed weak and tired all the time. (R. at 117.) According to Mickles, it took him almost an hour to fall asleep, and then he woke up every other hour due to pain. (R. at 67.) He testified it became difficult to perform his job, and his co-workers helped him perform his job duties, including moving equipment and holding up cables. (R. at 104.) He testified he was having trouble lifting, having back pain when on his feet and walking and getting short of breath quite a bit when shoveling. (R. at 55-56.) Mickles testified he had to lie on his back to operate the scoop, which had no shocks, and the "beating and banging" hurt his back pretty badly. (R. at 57.) Mickles stated toward the end of his employment, he could not walk 100 to 150 feet without stopping two to three times to rest. (R. at 105.)

Mickles testified he was in special education classes during school. (R. at 105.) He said he could not read or write, and he had problems understanding things on a regular basis. (R. at 62-63, 71.) Mickles stated he took his written driver's test at school, not at the DMV, and his teachers read the questions to him and helped him with the answers. (R. at 63, 106.) He testified he did not understand newspaper

headlines many times, he could not make a grocery list, and he could not read a grocery list made by someone else. (R. at 63.) Mickles testified he did not have checks, and went to the bank in person to conduct business. (R. at 116.) He said his sister read and completed paperwork for him, and that sister accompanied him to the hearing. (R. at 116.) Mickles testified he learned how to operate a scoop through hands on training, not by reading manuals. (R. at 72.) Mickles testified his 22-year-old son, who still lived with him, did the heavy chores, like mowing and taking out the trash. (R. at 115.) He stated he had always had depression, but it had worsened in the two to three months prior to the May 2020 hearing. (R. at 63.) Mickles testified his primary care provider began prescribing mental health medication seven months prior to the May 2020 hearing. (R. at 64.) At the time of the May 2020 hearing, he stated he was worrying about things going wrong, not sleeping well, hurting all the time and feeling like he did not want to be around anymore. (R. at 65.) Mickles stated he was having episodes of sadness and crying spells in 2018, but which had worsened in the month or two prior to the May 2020 hearing. (R. at 65.) He stated his primary care provider recently had doubled his dosage of Wellbutrin and prescribed Prozac, although he had not started taking it yet. (R. at 65-66.) Despite the increased Wellbutrin, Mickles testified he still was having feelings of not wanting to be around. (R. at 66.) He said he wanted to stay in bed when he awakened in the mornings, but his pain would not allow it. (R. at 66-67.)

In rendering his decision, the ALJ reviewed records from Lonesome Pine Hospital; Norton Community Hospital; Appalachian Healthcare Associates, P.C.; Mountain States Medical Group Cardiology; Mountain States Medical Group Pulmonology; Stone Mountain Health Services – St. Charles Community Health Clinic; Indian Path Medical Center; Appalachian Rehabilitation Team, Inc.; Dr. R. David Sheppard, D.O.; B. Wayne Lanthorn, Ph.D., licensed clinical psychologist;

Dr. Andrew J. Chapman, D.P.M., a podiatrist; Wellmont Cardiology Services; Dr. Gary C. Hubbard, O.D., an optometrist; Ballad Health Medical Associates Primary Care; Dr. Donald Williams, M.D., a state agency physician; Dr. Robert McGuffin, M.D., a state agency physician; and Ballad Health Medical Associates Neurosurgery and Spine.

On July 30, 2015, an echocardiogram showed mild tricuspid regurgitation, and a normal left ventricular ejection fraction, ("LVEF"), of 55 to 60 percent. (R. at 721-22.) X-rays of the lumbar spine, dated September 19, 2015, showed only mild degenerative change without acute abnormality. (R. at 713.) Mickles saw Dr. R. David Sheppard, D.O., his primary care provider, on September 22, 2015, with complaints of low back pain that radiated into his right side when bending over. (R. at 698.) He also endorsed back stiffness and sensory disturbances, but he denied feeling tired, chest pain, dyspnea, dizziness and fainting. (R. at 698.) On examination, he was 5 feet, 5 inches tall, and he weighed 247.4 pounds, placing his body mass index, ("BMI"), at 41.2. (R. at 698.) Mickles's oxygen saturation was 97 percent. (R. at 698.) He was alert, fully oriented and in no acute distress, with normal speech and a euthymic mood. (R. at 698-99.) Mickles's respiratory examination findings were normal, as were cardiovascular findings. (R. at 699.) There was tenderness to palpation of the lumbosacral spine, but no sensory or motor abnormalities, and reflexes were normal. (R. at 699.) Dr. Sheppard diagnosed backache and radiculopathy, he ordered diagnostic testing, and he prescribed Flexeril and 800 mg ibuprofen. (R. at 699.) A lumbar MRI, dated September 25, 2015, showed a mild annular bulge at the L2-L3 level and a minimal bulge at the L3-L4 level. (R. at 712.) X-rays of the thoracic spine, dated September 22, 2015, showed no significant degenerative changes. (R. at 711.)

Mickles was seen at St. Charles Breathing Center on May 2, 2016, for spirometry testing. (R. at 692.) This testing showed only a mild restriction. (R. at 688-89, 718-19.) A chest x-ray was ordered, which was negative for pneumoconiosis. (R. at 690-91.) Mickles returned to Dr. Sheppard on July 1, 2016, complaining of bilateral leg and foot pain. (R. at 697.) Specifically, he noted pain, burning and redness in both feet, with occasional itchiness. (R. at 697.) He, again, denied feeling tired, chest pain and dyspnea. (R. at 697.) Mickles's examination was normal, except for a rash on his feet. (R. at 697.) Dr. Sheppard diagnosed tinea pedis[5] and bilateral arthropathy of the ankle/foot. (R. at 698.) He ordered lab work, and he prescribed an antifungal/corticosteroid cream. (R. at 698.)

On June 21, 2016, Dr. Donald Williams, M.D., a state agency physician, completed a physical residual functional capacity assessment, finding Mickles could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; push and/or pull up to the lift/carry amounts; frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl; occasionally climb ladders, ropes and scaffolds; and he should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. (R. at 133-35.) Dr. Williams imposed no manipulative, visual or communicative limitations. (R. at 134.) He supported his findings with Mickles's degenerative disc disease, history of cardiac issues and shortness of breath. (R. at 133-35.) Dr. Williams concluded Mickles was capable of performing light work. (R. at 135.)

---

[5] Tinea pedis, also known as athlete's foot, is a fungal infection characterized by scaly, peeling or cracked skin between the toes; itchiness; inflamed skin that might appear reddish; burning or stinging; blisters; and dry, scaly skin on the bottom of the foot that extends up the side. *See* mayoclinic.org/diseases-conditions/athletes-foot/symptoms-causes/syc-20353841 (last visited Sept. 27, 2021).

On September 22, 2016, Dr. Robert McGuffin, M.D., a state agency physician, completed another physical residual functional capacity assessment, which was virtually identical to that of Dr. Williams. (R. at 145-47.) The only difference was that Dr. McGuffin also found Mickles should avoid concentrated exposure to hazards, such as machinery and heights. (R. at 147.) Like Dr. Williams, he concluded Mickles could perform light work, and he supported his findings by noting Mickles's degenerative disc disease, history of cardiac issues and shortness of breath. (R. at 146-47.) Dr. McGuffin additionally noted that Mickles's obesity likely may be a contributing factor to his physical conditions. (R. at 147.)

When Mickles returned to Dr. Sheppard on February 16, 2017, for a routine follow up, he endorsed chronic shortness of breath, which had gradually been worsening. (R. at 821.) He also described recurrent and sudden chest pain, which he rated as moderate, and he reported a previous diagnosis of cardiomegaly. (R. at 821.) Mickles denied fatigue, syncope, arthralgias, gait problems, joint swelling, neck pain, dizziness, tremors, weakness, light-headedness, numbness, headaches and sleep disturbance. (R. at 823.) On examination, he was alert and fully oriented, with a normal mood and affect; he was in no distress; he had a normal range of motion of the neck; normal cardiovascular findings; normal pulmonary/chest findings; normal musculoskeletal findings, including normal range of motion, no edema, tenderness or deformity; and normal neurological findings, including normal reflexes and no cranial deficit. (R. at 823-24.) Dr. Sheppard diagnosed essential hypertension, cardiomyopathy, mixed hyperlipidemia, dyspnea and unspecified chest pain, and he prescribed medications and ordered appropriate lab work, as well as a chest x-ray. (R. at 823-25.) He also referred Mickles to a pulmonologist and a cardiologist. (R. at 825, 827.) Chest x-rays taken that day showed no signs of cardiopulmonary disease. (R. at 820-21, 825-26.)

On August 28, 2017, Dr. Sheppard completed an Assessment Of Ability To Do Work-Related Activities (Physical), finding Mickles could lift/carry 20 pounds both occasionally and frequently; stand/walk for a total of two hours in an eight-hour workday and for two hours without interruption; sit for a total of two hours in an eight-hour workday; never perform any postural activities; never push/pull; and he could not work around heights, moving machinery, temperature extremes, chemicals, dust, fumes or humidity. (R. at 798-800.) Dr. Sheppard opined Mickles would miss more than two workdays monthly due to his impairment(s) or treatment. (R. at 800.) In support of his findings, Dr. Sheppard noted Mickles's chronic systolic congestive heart failure, ("CHF"), and mild restrictive lung disease. (R. at 798-800.)

Mickles saw B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, on October 4, 2017, for a psychological evaluation at his counsel's referral. (R. at 802-08.) He reported graduating from high school, but receiving special education services throughout most of his schooling, and he described himself as "currently illiterate." (R. at 803.) Mickles stated he was married with three grown children. (R. at 804.) Lanthorn noted Mickles had undergone no formal psychiatric treatment. (R. at 804.) He stated on a typical day, he did "hardly nothing." (R. at 805.) Mickles reported walking around every once in a while, attending church, socializing with family and his preacher and helping his daughter do laundry, cook and clean. (R. at 805.) Mickles's speech was clear and intelligible, and he exhibited no signs of ongoing psychotic processes, delusional thinking or hallucinations. (R. at 805.) Lanthorn described him as "relatively laconic," offering few spontaneous comments; his affect was flat and blunt, and his mood was depressed. (R. at 805.) Mickles stated he preferred being alone, but he denied suicidal or homicidal ideation, plan or intent, and he reported no attempts. (R. at 805.) He described a "very low" energy level, and he described himself as "weak." (R. at 805.) Lanthorn found Mickles was

-12-

irritable, but that he may be somewhat unaware of how irritable, as Mickles stated, "they say I am irritable." (R. at 805.) He perceived his future as "not too good." (R. at 805.) Mickles reported often being nervous and shaky, he had muscle tension, and he often felt "keyed up" and on edge. (R. at 805.) His concentration was erratic and somewhat unreliable. (R. at 805.) Mickles was able to recall four of five words after 10 minutes, but he could perform neither Serial 7s nor 3s, and he could interpret only one of three commonly used adages. (R. at 805.)

Lanthorn administered the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), on which Mickles obtained a full-scale IQ score of 71, placing him in the borderline range of intellectual functioning. (R. at 806.) He also administered the Minnesota Multiphasic Personality Inventory – 2, ("MMPI-2"), but Lanthorn stated, "It was very evident that Mr. Mickles' reading skills were not such that he would be capable of completing the MMPI-2. He is essentially illiterate." (R. at 806.) Lanthorn diagnosed Mickles with major depressive disorder, recurrent, moderate, with anxious distress, moderate. (R. at 80.) He opined Mickles was functioning at the bottom end of the borderline range intellectually, and he was "functioning illiterate." (R. at 806.) Lanthorn opined Mickles could understand, remember and make decisions on mildly complicated instructions. (R. at 806.) He noted Mickles socialized primarily with family members, and his general adaptation skills reflected mild to moderate symptoms. (R. at 806.)

Lanthorn also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental), dated October 25, 2017, finding Mickles was mildly[6]

---

[6] This Assessment defines a mild limitation as a slight limitation, but the individual can, generally, function well. (R. at 810.)

limited in his ability to understand, remember and carry out simple job instructions; moderately[7] limited in his ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment in public, to interact with supervisors, to function independently, to understand, remember and carry out detailed job instructions, to maintain personal appearance and to demonstrate reliability; and markedly[8] limited in his ability to deal with work stresses, to maintain attention/concentration, to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 810-12.) Lanthorn opined Mickles would miss more than two workdays monthly due to his impairment(s) or treatment. (R. at 812.) In support of his findings, Lanthorn referenced his "report." (R. at 810-12.)

On July 8, 2019, Mickles returned to Dr. Sheppard to re-establish care after not having been seen for multiple years, indicating he had lost his insurance. (R. at 835.) Mickles reported he had lost his CPAP machine, and he stated he ran out medications "years ago." (R. at 835.) He endorsed fatigue, arthralgias in the feet, dysphoric mood, anxiety and sleep disturbance, but he denied respiratory or cardiovascular symptoms, dizziness, weakness, light-headedness, numbness and headaches. (R. at 835-37.) On examination, he was alert and fully oriented, with a normal mood and affect. (R. at 837-38.) He had a normal range of motion of the neck; cardiovascular and pulmonary/chest findings were normal; musculoskeletal findings were normal, including normal range of motion, no edema, tenderness or deformity; and neurological findings were normal, including normal reflexes and no

---

[7] This Assessment defines a moderate limitation as more than a slight limitation, but the individual still is able to function satisfactorily. (R. at 810.)

[8] This Assessment defines a marked limitation as a serious limitation and substantial loss in the ability to effectively function, resulting in unsatisfactory work performance. (R. at 810.)

cranial nerve deficit. (R. at 837-38.) Dr. Sheppard added OSA syndrome, other specified glaucoma, plantar fasciitis of the left foot and anxiety and depression to Mickles's diagnoses. (R. at 838.) He prescribed medications, including Wellbutrin, he ordered appropriate lab work, he referred Mickles to a podiatrist and a cardiologist, and he ordered a replacement CPAP machine. (R. at 838-39.)

Mickles continued to treat with Dr. Sheppard throughout the remainder of 2019. In August 2019, he reported significant improvement of his hypertension with his current treatment, and his blood pressure was 122/74. (R. at 843, 845.) Mickles complained of daytime fatigue, snoring and not feeling rested upon awakening, but he had not undergone a sleep study. (R. at 843.) His examination remained unchanged and completely normal. (R. at 845-46.) Dr. Sheppard continued Mickles on medications and referred him to sleep medicine. (R. at 846-47.) On November 14, 2019, Dr. Sheppard noted Mickles's recent lipid testing was normal, as current treatment provided significant improvement. (R. at 880.) He, likewise, described Mickles's hypertension was well-controlled with current treatment, and it was 120/80 at that time. (R. at 880, 882.) Mickles reported a recent echocardiogram showed improvement. (R. at 880.) He endorsed shortness of breath, dysphoric mood and anxiety, but he denied fatigue, chest pain, arthralgias, dizziness, weakness, numbness and headaches. (R. at 881-82.) He reported Wellbutrin was not working, as he continued to feel depressed. (R. at 880.) On examination, Dr. Sheppard noted Mickles had a depressed mood. (R. at 882.) Otherwise, findings continued to be normal. (R. at 882.) Dr. Sheppard added Lexapro to Mickles's medication regimen. (R. at 883.) By December 13, 2019, Mickles reported doing well on Lexapro and Wellbutrin, noting he was much less anxious. (R. at 875.) He denied fatigue, shortness of breath, chest pain, arthralgias, weakness, numbness and headaches. (R. at 876.) On examination, Mickles's mood was back to normal, and all other findings

remained normal. (R. at 877.) Dr. Sheppard's diagnoses were unchanged, and he ordered appropriate lab work. (R. at 877-78.)

Mickles saw Dr. Shipeng Yu, M.D., a cardiologist at Wellmont Cardiology Services, on September 9, 2019, for complaints of dyspnea on exertion and chest pain for the previous five or six years. (R. at 854.) A prior medical history of CHF; three heart catheterizations with no coronary artery disease identified; and OSA on CPAP therapy, but not using due to a lack of insurance, were noted. (R. at 854.) Mickles reported getting "a bit" short of breath when walking to his mailbox and more shortness of breath with more activity. (R. at 854.) He reported no clear paroxysmal nocturnal dyspnea.[9] (R. at 854.) Dr. Yu noted a 2015 echocardiogram showed an ejection fraction of 55 percent and mild tricuspid regurgitation, and a left heart catheterization in 2015 was negative. (R. at 854.) On examination, Mickles was in no acute distress; lungs were clear to auscultation, bilaterally, with equal expansion, and he gave normal respiratory effort; there was regular heart rate, rhythm and sounds, with no gallop, rub or murmurs; muscle strength was symmetric, and there was no clubbing, cyanosis or edema; radial and pedal pulses were +2, bilaterally; sensory and motor function were grossly intact; mood was appropriate; and judgment seemed normal. (R. at 856.) An EKG showed a borderline left axis deviation, but was, otherwise, normal. (R. at 856-57.) Dr. Yu diagnosed cardiomyopathy, unspecified type; CHF with left ventricular diastolic dysfunction, chronic; hypertension, controlled; and morbid obesity. (R. at 858.) He noted

---

[9] PND refers to a feeling of suffocation when not engaged in any strenuous activity, such as while sleeping, and can be a sign of heart failure. *See* webmd.com/sleep-disorders/what-is-paroxysmal-nocturnal-dyspnea (last visited Sept. 27, 2022).

Mickles's CHF to be New York Heart Association, ("NYHA") Class II to III.[10] (R. at 858.) Dr. Yu ordered an echocardiogram, prescribed Lasix, continued his blood pressure and cholesterol medications, and he recommended weight loss. (R. at 858.) This echocardiogram was performed on November 5, 2019, and showed a normal LVEF of 55 to 60 percent; indeterminate diastolic function; and no evidence of pulmonary hypertension based on right ventricular systolic pressure. (R. at 868-69.) At that time, Mickles's CHF was noted to be NYHA Class I,[11] acute non-chronic, diastolic. (R. at 866.) When Mickles saw Dr. Yu on November 7, 2019, his physical examination was unchanged and yielded completely normal findings. (R. at 861.) An EKG showed sinus rhythm and borderline T wave abnormalities. (R. at 861.) Dr. Yu diagnosed benign essential hypertension; dyspnea, unspecified type, likely from the lung, noncardiac; other chest pain, noncardiac; and class 2 obesity. (R. at 866.) He advised Mickles to keep a blood pressure log, exercise, lose weight and control his diet. (R. at 866.) Dr. Yu also prescribed nitroglycerin for Mickles, and he referred him to a lung specialist. (R. at 866.) He instructed him to return in one year. (R. at 866.)

Mickles saw Dr. Andrew J. Chapman, D.P.M., a podiatrist, for bilateral foot pain on August 12, 2019. (R. at 848.) He described red and peeling skin for the prior 15 years, but without associated itching or pain. (R. at 848.) Mickles also reported a

---

[10] NYHA Class II heart failure indicates the individual has mild limitation, meaning ordinary physical activity causes fatigue, dyspnea, palpitations or angina. NYHA Class III heart failure indicates the individual has moderate limitation, meaning he is comfortable at rest, and less than ordinary physical activity causes fatigue, dyspnea, palpitations or angina. *See* merckmanuals.com/professional/multimedia/table/new-york-heart-association-nyha-classification-of-heart-failure (last visited Sept. 27, 2022).

[11] NYHA Class I heart failure indicates ordinary physical activity does not cause undue fatigue, dyspnea or palpitations. *See* merckmanuals.com/professional/multimedia/table/new-york-heart-association-nyha-classification-of-heart-failure (last visited Sept. 27, 2022).

"sharp, aching pain that runs from [the] pinky toes down [the] side of [the] feet into [the] heels." (R. at 848.) He reported numbness and tingling in the hands and feet, bilaterally, for some time, and he reported a previous diagnosis of bilateral CTS. (R. at 848-49.) He said that walking with shoes made his feet more uncomfortable and more numb, but walking barefoot also was painful. (R. at 848.) According to Mickles, he had a five- to six-year history of untreated diabetes. (R. at 848.) He also endorsed shortness of breath, chest pain with tightness or pressure, high blood pressure and joint stiffness or pain. (R. at 848.) Mickles reported having neck problems and having been diagnosed with glaucoma earlier that same day. (R. at 848-49.) On examination, Mickles's dorsal pedal pulses were 3/4, bilaterally, and posterior tibial pulses were 1/4, bilaterally; capillary refill time was less than two seconds, bilaterally; there was moderate edema, bilaterally; there was erythema and scaling of the plantar, dorsum, forefoot and all digits on both feet; Achilles reflex was 1/4; sensation was intact; range of motion was normal; strength was 5/5; there were bursae[12] with pressure ulcerations at the lateral plantar midfoot, bilaterally, but left greater than right; and no neuropathy. (R. at 849-50.) Dr. Chapman diagnosed type 2 diabetes without complications; tinea pedis; bursitis, not elsewhere classified, of both ankles and feet; congenital metatarsus adductus;[13] and radiculopathy, lumbosacral region. (R. at 850.) He related the numb sensation in Mickles's feet to probable radiculopathy from his lower back. (R. at 851.) Dr. Chapman administered a cortisone injection to the left foot for Mickles's bursitis, and he prescribed Lamisil. (R. at 851.)

---

[12] A bursa is a small, fluid-filled sac that cushions the bones, tendons and muscles near the joints. Bursitis occurs when the bursae become inflamed. *See* mayoclinic.org/diseases-conditions/bursitis/symptoms-causes/syc-20353242 (last visited Sept. 27, 2022).

[13] Metatarsus adductus is a common foot deformity noted at birth that causes the front half of the foot to turn inward. *See* chop.edu/conditions-diseases/metatarsus-adductus (last visited Sept. 27, 2022).

When he returned to Dr. Chapman on October 8, 2019, Mickles reported the injection helped some briefly, but his left foot continued to hurt worse than his right foot. (R. at 852.) He stated Lamisil helped with the scaling on his feet. (R. at 852.) On examination, Mickles was appropriately dressed, articulate, alert and fully oriented. (R. at 853.) The erythema/scaling had nearly resolved on both feet; the ulcerated bursa on the left foot was slightly decreased in size, but still larger than on the right foot; and there was forefoot adductus, bilaterally. (R. at 853.) Dr. Chapman administered another injection into Mickles's left foot. (R. at 853.) When he returned on November 13, 2019, after missing several appointments, Mickles said the two injections in his left foot helped some, but both feet hurt and were more painful when wearing shoes and with prolonged weightbearing. (R. at 892.) He complained his right foot hurt worse that day. (R. at 892.) On examination, Mickles, again, was appropriately dressed, articulate, alert and fully oriented. (R. at 893.) Neurologic vital signs were intact in both lower extremities; there was moderate ulceration at the plantar region of the right foot with a palpable, fluid-filled cyst, but an identical cyst on the left foot had resolved. (R. at 893.) Dr. Chapman stated that x-rays showed an accessory cuboid bone at the symptomatic area of the right foot, which was causing Mickles's rearfoot pain. (R. at 893.) He added other specified congenital deformities of the feet to Mickles's diagnoses. (R. at 893.) Dr. Chapman applied an off load to Mickles's shoe gear to accommodate these bones, and he administered a cortisone injection in the right rearfoot. (R. at 893.) On December 11, 2019, Mickles advised Dr. Chapman this injection helped less than 50 percent, and the shoe pad helped some. (R. at 894.) He complained of bilateral heel pain with prolonged weightbearing, which Dr. Chapman explained would be treated after Mickles's other complaints had resolved. (R. at 894-95.) On examination, the bursa underneath the fifth metatarsal base on the right was smaller in size and ulceration. (R. at 895.) Dr. Chapman administered another cortisone injection to this region. (R. at 895.)

Mickles also treated with Dr. Gary C. Hubbard, O.D., an optometrist, from July 2019 through January 2020. (R. at 871-73, 900-01.) Mickles's retina and macula were normal, but testing indicated thin corneas, bilaterally; retinal nerve fiber loss; and low-tension glaucoma, for which medication was prescribed in August 2019. (R. at 871-73.) By the following month, Mickles's pressure was reduced by about 20 percent. (R. at 872.) In October 2019, Mickles's eyes were stable, and Dr. Hubbard continued his medication. (R. at 873.) In January 2020, glaucoma and an age-appropriate cataract were noted, as were dry eyes, for which Dr. Hubbard prescribed an anti-inflammatory eye drop. (R. at 900-01.)

Mickles continued treating with Dr. Sheppard in 2020. On March 19, 2020, he requested Dr. Sheppard complete disability paperwork. (R. at 910.) Mickles noted a history of a pinched nerve in his neck, which had led to intermittent, but gradually worsening, neck pain, with associated numbness in both arms. (R. at 910.) He stated non-steroidal anti-inflammatory drugs, ("NSAIDs"), provided no relief. (R. at 910.) Mickles also reported moderate, but intermittent, lumbar back pain, which had waxed and waned since onset more than one year previously, and which he rated as a seven on a 10-point scale. (R. at 910.) Lastly, he complained of chronic depression. (R. at 910.) Mickles denied fatigue, shortness of breath, chest pain, weakness, numbness and headaches. (R. at 912.) On examination, he was alert and fully oriented, with a normal mood and affect. (R. at 913.) He had a normal range of motion of the neck; normal heart rate, rhythm and sounds, with no murmur; normal respiratory effort and normal breath sounds, without stridor, wheezes or rales, and he was in no respiratory distress; there was no musculoskeletal deformity or edema; he had decreased range of motion and tenderness of the cervical and lumbar back; reflexes were normal; and there was no cranial nerve deficit. (R. at 913.) Dr. Sheppard added neck pain, lumbar back pain and reactive depression to his

diagnoses. (R. at 913.) He ordered diagnostic imaging of Mickles's back and neck, and he doubled his Wellbutrin dosage. (R. at 914.) Lumbar spine x-rays from this date showed shallow levoscoliosis and multi-level, mild degenerative changes. (R. at 905.) X-rays of the cervical spine from the same date showed mild, multi-level degenerative changes. (R. at 907.) When Mickles returned to Dr. Sheppard on April 15, 2020, he stated his "nerves" had improved with Lexapro and the increased dosage of Wellbutrin. (R. at 922.) He complained of fatigue and chronic pain, including neck pain and stiffness. (R. at 922-23.) Dr. Sheppard stated that Mickles's cervical spine x-rays showed arthritic changes, and he was scheduled for an MRI. (R. at 921.) Mickles's examination was completely normal, including normal range of musculoskeletal motion without tenderness. (R. at 924-25.) Dr. Sheppard added spondylosis of the cervical region without myelopathy or radiculopathy to Mickles's diagnoses, for which he prescribed 800 mg ibuprofen. (R. at 925.)

Dr. Sheppard completed a physical assessment of Mickles's work-related abilities on April 20, 2020, finding Mickles could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk a total of two hours in an eight-hour day; sit a total of two hours in an eight-hour day; occasionally stoop, kneel and balance; never climb, crouch or crawl; his ability to push/pull was affected by his impairment; and he was restricted from working around heights and moving machinery. (R. at 902-04.) As support for these findings, Dr. Sheppard noted Mickles's multi-level degenerative joint disease of the cervical and lumbar spine and resulting back pain. (R. at 902-04.) Dr. Sheppard found Mickles would be absent more than two workdays monthly. (R. at 904.)

An MRI of the cervical spine, dated May 20, 2020, showed no acute bony changes; a broad-based, left-sided disc protrusion at the C6-C7 level, causing

significant compromise of the left neural foramina and the left lateral recess; and minimal compromise of the neural foramina at the C4-C5 level by a bulging annulus, left more than right. (R. at 927-28.)

Mickles also continued to treat with Dr. Chapman in 2020. On January 8, 2020, he reported the previous injection in his right rearfoot helped some, but he said his feet hurt with prolonged standing, and he had sharp pain down the sides of his feet, right worse than left. (R. at 896.) On examination, neurological vital signs were intact in both lower extremities; there was ulceration and bursa at the distal lateral one-third of the fifth right metatarsal bone. (R. at 896.) Dr. Chapman administered another cortisone injection in the right foot, and he recommended special insoles to reduce Mickles's tendency to form acquired bursae secondary to his metatarsus adductus foot type. (R. at 897.) However, Mickles declined at that time. (R. at 897.) On February 5, 2020, he told Dr. Chapman the injection helped somewhat, but both feet hurt in the styloid process area. (R. at 898.) Mickles was appropriately dressed, articulate, alert and fully oriented. (R. at 899.) There was a very mild ulceration at the fifth metatarsal base without a palpable bursal cyst, bilaterally; and there was a bunion at the left foot with a resolving bursitis with minimal ulceration. (R. at 899.) Dr. Chapman added peroneal tendonitis unspecified leg, to Mickles's diagnoses. (R. at 899.) He placed him on an oral corticosteroid, explaining that his conditions had improved to a degree so as not to require further injections. (R. at 899.) Although Dr. Chapman advised Mickles that his remaining symptoms likely would resolve with use of an appropriate insole, he continued to decline. (R. at 899.) At that time, Dr. Chapman released Mickles from his care to return as needed. (R. at 899.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2021). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2021).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Mickles argues the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-6.) Mickles argues the ALJ erred by rejecting the opinions of Dr. Sheppard and Lanthorn and by relying on the opinions

of the state agency physicians. (Plaintiff's Brief at 6.) Mickles contends the state agency consultants' assessments were "stale [and] outdated." (Plaintiff's Brief at 6.)

The ALJ is not required to adopt a residual functional capacity assessment of a treating or examining physician in determining a claimant's residual functional capacity. Instead, the ALJ is solely responsible for determining a claimant's residual functional capacity. *See* 20 C.F.R. § 404.1546(c) (2021); *see also* 20 C.F.R. § 404.1527(d)(2) (2021) (a claimant's residual functional capacity is an issue reserved exclusively to the Commissioner). The relevant question is whether the ALJ's residual functional capacity assessment is based upon and supported by all the relevant evidence, including medical records, medical source opinions and the claimant's subjective allegations and description of his own limitations. *See* 20 C.F.R. § 404.1545 (2021).

A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. § 404.1545(a). The ALJ found Mickles had the residual functional capacity to perform sedentary work, except he could occasionally lift 20 pounds and frequently lift 10 pounds; he required a sit-stand option at will; he could never climb ladders, ropes or scaffolds; he could frequently balance; he could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; he could occasionally reach overhead; and he should avoid concentrated exposure to pulmonary irritants, chemicals and hazards, such as moving machinery and heights. (R. at 29.)

In making this residual functional capacity finding, the ALJ stated he was giving "little weight" to Lanthorn's October 2017 evaluation and work-related

mental assessment, in which he opined Mickles was "essentially illiterate;"[14] functioning in the bottom end of the borderline intellectual range; could understand, remember and make decisions regarding only mildly complicated instructions; and had marked limitations dealing with work stresses, maintaining attention/concentration, dealing with complex job instructions, behaving in an emotionally stable manner and being predictable in social situations.[15] (R. at 27-28, 806, 810-12.) Lanthorn also opined Mickles would be absent from work more than two days monthly. (R. at 812.) Specifically, the ALJ stated that, although Lanthorn's evaluation "somewhat supported"[16] his findings regarding Mickles's intellectual functioning, it was not consistent[17] with the other record evidence, which showed greater intellectual abilities. (R. at 28.) In particular, the ALJ acknowledged Lanthorn's finding that Mickles was unable to perform Serial 7 and Serial 3 testing during his evaluation, and his testing during the evaluation yielded a low full-scale IQ score, placing him in the borderline range. (R. at 27, 805-06.) The ALJ noted Mickles had been able to perform Basic Algebra in high school, albeit with individualized instruction, which indicates a greater math ability than reflected by Lanthorn's evaluation. (R. at 27, 415.) Nonetheless, the ALJ also noted that, while

---

[14] The regulations define illiteracy as "the inability to read or write." An individual is considered illiterate "if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name." The regulations further state that, "[g]enerally, an illiterate person has had little or no formal schooling." 20 C.F.R. § 404.1564(b)(1) (2021).

[15] The undersigned notes that, because Mickles filed his claim prior to March 27, 2017, the new regulatory framework for considering medical opinion evidence does not apply in this case. Instead, the ALJ's consideration of the medical opinion evidence in this case is governed by 20 C.F.R. § 404.1527.

[16] The more relevant evidence a medical source presents to support a medical opinion, the more weight it will receive. *See* 20 C.F.R. § 404.1527(c)(3) (2021).

[17] Generally, the more consistent a medical opinion is with the record as a whole, the more weight it will receive. *See* 20 C.F.R. § 404.1527(c)(4) (2021).

Mickles's education records showed a reduced reading ability during elementary school, they still indicated a basic reading ability. (R. at 27, 422.) Specifically, these records indicated Mickles had a grade 2.6 reading level during the first semester of his fourth grade year and a grade 1.7 reading level during the first semester of his fifth grade year. (R. at 422.) Moreover, the ALJ further noted that, although Mickles had individualized instruction in many high school classes, he, nonetheless, passed them with As, Bs and Cs, indicating some reading ability. (R. at 27, 422.) There is no evidence Mickles was ever retained in any grade throughout school, or that he received any special education services while in elementary school. Additionally, the ALJ noted that, nowhere in his school records was it noted that Mickles was illiterate. (R. at 27.) While a teacher's undated notation during Mickles's elementary school years states he had a "speech problem," there is no indication of illiteracy. (R. at 419.) Moreover, despite his testimony at the March 2018 hearing that he could not complete paperwork, the court also notes that, in a Disability Report from March 2016, Mickles indicated he, personally, completed the form, and he answered "yes" to the questions whether he could read and understand English, as well as whether he could write more than his name in English. (R. at 363-64.) Lastly, the ALJ noted that the vocational expert testified Mickles had performed both semi-skilled and skilled past relevant work, further indicating his intellectual ability was greater than in the borderline range and indicating an ability to perform complex work. (R. at 27-28, 74-75.) *See Hancock v. Astrue*, 667 F.3d 470, 475-76 (4th Cir. 2012) (considering a claimant's past semi-skilled work as a factor in finding she suffered from no deficits in adaptive functioning); *see also Williams v. Comm'r of Soc. Sec.*, 2014 WL 5361311, at *6 (W.D. Va. Oct. 21, 2014) (the nature of a person's past work matters when assessing deficits in adaptive functioning).

As for Lanthorn's opinion that Mickles had several marked, work-related mental limitations, the ALJ stated such harsh findings were not supported by Lanthorn's own examination. (R. at 28.) Specifically, although Lanthorn found Mickles had a flat and blunted affect, which could indicate depression, the ALJ correctly stated that this finding, alone, does not indicate Mickles would have substantial concentration difficulties. (R. at 28.) Despite a flat and blunted affect, Lanthorn found Mickles's speech was clear and intelligible, he exhibited no signs of ongoing psychotic processes, delusional thinking or hallucinations, he denied suicidal or homicidal ideations, and he was able to recall four of five words after 10 minutes. (R. at 805.) Additionally, the ALJ found Lanthorn's limitations were not consistent with the other record evidence, including the lack of treatment by a mental health practitioner. (R. at 28.) Instead, Mickles received treatment for his mental health complaints from his primary care provider, who treated him conservatively with medication. As noted by the ALJ, Mickles's mental status findings, generally, were normal, as specified herein. When he presented for the first time to a treating provider with complaints of depression and anxiety in July 2019, Dr. Sheppard prescribed medication, and by the following month, Mickles stated it had been helping. (R. at 838-39, 843.) In November 2019, when Mickles advised the medication was not working, and he continued to feel depressed, Dr. Sheppard added another psychiatric medication to his regimen. (R. at 880, 883.) By the next month, Mickles reported doing well and feeling much less anxious, and his mood was back to normal on examination. (R. at 875, 877.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). Moreover, the court notes that Mickles did not complain of concentration issues to treating providers, nor did they document any such issues. Lastly, the court notes that Mickles did not allege disability, either initially or on reconsideration, due to any mental health impairment. Instead, as

-27-

noted above, the first complaint of any mental health issue to a treating provider was in July 2019.

The ALJ stated he was giving "significant weight" to the opinions of the state agency reviewers, Dr. Williams and Dr. McGuffin, neither of whom found that Mickles had a severe mental impairment. (R. at 28, 132, 144.) The ALJ found this was consistent with the record evidence, which did not reflect significant psychological abnormalities. (R. at 28.) In particular, the ALJ again relied on Mickles's ability to pass challenging educational subject matter, such as Biology, despite having some reading difficulty during elementary school and receiving individualized instruction during high school, as well as his history of performing skilled work. (R. at 28.) The court emphasizes that, not only was Mickles able to pass his classes, but he achieved grades of As, Bs and Cs throughout high school. Contrary to his counsel's argument at the March 2018 hearing, the court finds this does not indicate an illiterate individual of borderline intellectual functioning who simply is being passed through school to graduation. (R. at 93-94.)

For all these reasons, I find that substantial evidence supports the ALJ's weighing of the evidence related to Mickles's mental health impairments.

With respect to Mickles's physical impairments, the ALJ stated his residual functional capacity accommodated his breathing difficulty with limitations on pulmonary irritants, light lifting/carrying and sedentary standing/walking limitations. (R. at 34.) The ALJ correctly stated that Mickles's cardiologist, Dr. Yu, did not find his shortness of breath was cardiac related or that it caused stress on his heart. (R. at 34.) In August 2015, Mickles's pulmonary provider felt Mickles's obesity and deconditioning could be causing his shortness of breath. (R. at 34.)

Nonetheless, pulmonary function testing showed only mild airway obstruction, which the pulmonary provider did not indicate would cause great shortness of breath, and the ALJ agreed. (R. at 34.) The ALJ also correctly noted that Mickles's examinations generally yielded normal respiratory findings. (R. at 34.) Although the ALJ noted Mickles's obesity, which he acknowledged could contribute to Mickles's shortness of breath, he also found it would not result in intense respiratory issues. (R. at 34.) Next, the ALJ found that Mickles's heart and hypertension conditions were accommodated by the residual functional capacity restriction to the light lifting/carrying level. (R. at 34.) Specifically, the ALJ stated Mickles reported chest pain in April 2015 and later visits, but this was not listed as an issue when he re-established care with Dr. Sheppard in July 2019 after not having treated there since February 2017. (R. at 34.) The ALJ correctly stated that cardiology studies reflected only mild abnormalities, and Dr. Yu imposed no restrictions on Mickles. (R. at 34.) For instance, a July 2015 echocardiogram showed mild tricuspid regurgitation, but normal LVEF of 55 to 60 percent, and his most recent heart catheterization from 2015 was negative. (R. at 721-22, 854.) February 2017 chest x-rays showed no evidence of cardiopulmonary disease. (R. at 820-21, 825-26.) In September 2019, an EKG was normal, except for left axis deviation. (R. at 856-57.) In November 2019, an echocardiogram showed normal LVEF of 55 to 60 percent and no evidence of pulmonary hypertension. (R. at 868-69.) Mickles advised Dr. Sheppard this echocardiogram showed improvement. (R. at 880.) Also in November 2019, an EKG showed borderline T wave abnormalities, but sinus rhythm. (R. at 861.) In November 2019, Dr. Yu scheduled Mickles to return for a follow up in one year, which the ALJ correctly noted indicated Mickles's condition was not problematic. (R. at 34.) The court additionally notes that the only instructions from Dr. Yu to Mickles were to keep a blood pressure and heart rate log, and to exercise, control his diet and lose weight. (R. at 866.) Although there is mention of NYHA Class II to III in September

2019, indicating mild to moderate limitations, by November 2019, Mickles's heart failure was rated as Class I, indicating that ordinary physical activity did not cause undue fatigue, dyspnea or palpitation. (R. at 858, 866.) Moreover, although Mickles was diagnosed with hypertension, the ALJ stated that the record indicates no particular symptoms resulting therefrom. (R. at 34.) Next, the ALJ found his residual functional capacity, which included light lifting/carrying restrictions and sedentary standing/walking restrictions, as well as a limitation on working around hazards, accommodated Mickles's complaints of fatigue and daytime tiredness. (R. at 35.) In particular, he noted a prior diagnosis of sleep apnea, for which Mickles was prescribed a CPAP machine, but which Mickles reported he lost due to a lack of insurance. (R. at 35.) The ALJ found that, if Mickles's fatigue and drowsiness had been intense, he likely would have pursued treatment, possibly at a free clinic, and at least investigated his options for obtaining a new machine. (R. at 35.) Moreover, the ALJ correctly found that the record does not indicate intense fatigue, and Mickles did not indicate to his treating providers the need to lie down much of the time for any reason. (R. at 35.)

In his decision, the ALJ stated he was giving Dr. Sheppard's August 28, 2017, assessment "some weight," and his April 20, 2020, assessment "less weight." In August 2017, Dr. Sheppard opined Mickles could lift/carry 20 pounds both occasionally and frequently; stand/walk for a total of two-hours in an eight-hour workday and for two hours at a time; sit for a total of two hours in an eight-hour workday; never perform any postural activities; never push/pull; and he could not work around heights, moving machinery, temperature extremes, chemicals, dust, fumes or humidity. (R. at 798-800.) He opined Mickles would be absent from work more than two days monthly. (R. at 800.) Dr. Sheppard noted Mickles's chronic systolic CHF and mild restrictive lung disease in support of his findings. (R. at 798-

800.) In April 2020, Dr. Sheppard opined Mickles could lift/carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk a total of two hours in an eight-hour workday; sit a total of two hours in an eight-hour workday; occasionally stoop, kneel and balance; never climb, crouch or crawl; his ability to push/pull was affected by his impairment; and he was restricted from working around heights and moving machinery. (R. at 902-04.) He, again, opined Mickles would be absent from work more than two days monthly, and he noted Mickles's multi-level degenerative joint disease of the cervical and lumbar spine and resulting back pain as support for his findings. (R. at 902-04.)

With regard to the August 2017 assessment, which the ALJ afforded "some weight," he correctly noted that, although Dr. Sheppard listed Mickles's heart failure and mild respiratory disorder as support for his findings, this is not supported by his own examinations of Mickles, which reveal no cardiac or respiratory abnormalities. (R. at 35, 36.) The court notes that, at the time Dr. Sheppard completed this assessment, he had not seen Mickles since February 2017, six months previously. At that time, Mickles had normal heart rate, rhythm and sounds, with no murmur. (R. at 824.) He also had normal respiratory effort and breath sounds, no stridor, wheezes or rales, and he was in no respiratory distress. (R. at 824.) His pulse oxygen level was 98 percent. (R. at 823.) Moreover, the ALJ noted that Dr. Sheppard is not a specialist, and neither Mickles's cardiologist nor pulmonologist indicated his heart or pulmonary obstruction issues required any limitations. (R. at 35.) *See* 20 C.F.R. § 404.1527(c)(5) (2021) (more weight generally given to a specialist's opinion about medical issues related to his area of specialty than to an opinion of a medical source not a specialist). Nonetheless, the ALJ noted Mickles's morbid obesity, which, along with some heart abnormalities, would indicate that his lifting/carrying and standing/walking is limited to about the levels found by Dr. Sheppard. (R. at 35.)

However, the ALJ noted that these same issues did not indicate Mickles could never perform postural actions, and such a finding is internally inconsistent with Dr. Sheppard's lifting/carrying findings. (R. at 35.) Lastly, the ALJ noted that Mickles's obesity, cardiac, lung and sleep apnea issues would not be expected to cause significant sitting issues, as found by Dr. Sheppard. (R. at 35.)

With regard to the April 2020 assessment, which the ALJ afforded "less weight," he noted that, although Dr. Sheppard listed Mickles's cervical and lumbar spinal issues as support for his findings, Dr. Sheppard's limitations are not supported by his own examination findings. (R. at 35, 36.) For instance, as the ALJ stated, Dr. Sheppard's examination did not reflect any neurological issues, or even general spinal musculoskeletal abnormalities. (R. at 35, 823-24, 837-38, 877, 882, 913, 924-25.) Additionally, the findings are inconsistent with the other evidence of record, which indicates Mickles did not see a back specialist, and he did not voice many complaints about back pain. (R. at 35.) Moreover, the diagnostic imaging and clinical correlation of Mickles's back symptoms do not support significant limitations. For example, cervical spine imaging from early in the relevant time period did not show substantial degeneration, while imaging toward the end of the relevant time period, showed a disc protrusion. (R. at 35, 907, 927-28.) Nonetheless, there are no examination findings of upper extremity weakness in the record. (R. at 35.) Lumbar spine imaging showed only mild lumbar degeneration, and Mickles did not complain very much about lumbar pain. (R. at 35, 905.) The ALJ concluded that, under these circumstances, his residual functional capacity, with modified light level accommodations, including light level lifting/carrying limitations, would accommodate Mickles's cervical spine issues, including left shoulder numbness with overhead reaching, as well as his lumbar spine issues. (R. at 35.)

The ALJ gave "some weight" to the opinions of Dr. Williams and Dr. McGuffin, the state agency physicians. (R. at 36.) Dr. Williams opined Mickles could perform light work, except he could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl; occasionally climb ladders, ropes and scaffolds; and he should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. (R. at 133-35.) Dr. McGuffin's findings were virtually identical to those of Dr. Williams, except he also opined Mickles should avoid concentrated exposure to hazards. (R. at 145-47.) Both Dr. Williams and Dr. McGuffin supported their findings with Mickles's degenerative disc disease, history of cardiac issues and shortness of breath, and Dr. McGuffin additionally noted that Mickles's obesity likely may be a contributing factor to his physical condition. (R. at 133-35, 146-47.) These findings are similar to the residual functional capacity as found by the ALJ, except Drs. Williams and McGuffin found Mickles could perform standing/walking at the light exertional level. (R. at 133-34, 146.) The ALJ further restricted Mickles's ability to stand/walk, noting that his obesity and sleep apnea might cause more difficulty in these areas.

Mickles argues that the ALJ should have given the state agency consultants' assessments less weight because they were "stale [and] outdated," as they did not have the benefit of reviewing the updated records and opinions from his treating providers. (Plaintiff's Brief at 6.) However, the simple fact that those opinions came later in time than the state agency opinions does not mean that they should be accorded greater weight. As the Third Circuit has noted, "[B]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356,

361 (3d Cir. 2011); *see also Stricker v. Colvin*, 2016 WL 543216, at \*3 (N.D. W. Va. Feb. 10, 2016) ("[A] lapse of time between State agency physician opinions and the ALJ's decision does not render the opinion stale.")

It is apparent from the ALJ's thorough decision that he carefully evaluated the whole record before him when weighing the opinion evidence and before ultimately rendering his residual functional capacity finding, as set out herein, which is appropriately based upon all the relevant evidence.

Based on this, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence and his residual functional capacity finding. An appropriate Order and Judgment will be entered.

DATED:    September 27, 2022.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE